Thank you, Your Honors. Good morning. May it please the Court, my name is Robert Graziano, and I represent the Petitioner-Respondent Nazar Duzchyan. I would like to respectfully reserve one minute for rebuttal at the conclusion of this part of my argument. Thank you, Your Honor. Your Honor, this case is about three issues. The first is whether a respondent has set forth a case showing that he has a well-founded fear of persecution. A petitioner would concede that the record evidence would not compel a finding of past persecution, but we believe that the record evidence would compel a finding of a well-founded fear of persecution. Mr. Duzchyan left Armenia because he realized quickly that expressing any political opinion in a newly created nation of Armenia created a serious risk of persecution. He realized this because he experienced it himself. He had more than two encounters, although two were quite memorable and are well-documented in the record. His political activities, although short-lived, were neither incredible nor were they inconsequential. And we believe that his experiences are well-documented in the record that currently exists concerning Armenia. The 2016-2014 reports all talk about the systematic corruption, lack of transparency, and the fact that there's really no ability for political opposition or even peaceful demonstration to go forward in Armenia. A case, unfortunately not cited by a respondent, goes back to 2004, the case of Mamouzian versus Ashcroft, 390 F. 3rd, 1129. And even at that point, this court ruled that the 96-98 Armenia country reports did, in fact, support a finding of political persecution in Armenia being objectively reasonable. Did I understand you correctly right now when you said that you concede there was no past persecution? Your Honor, we would concede that the record would not compel a finding of past persecution. But we are relying on the issue of whether or not Mr. Duzchyan would have a well-founded fear of future persecution. It matters a lot whether there's past persecution because it alters the burden of proof. Yes, Your Honor. If there's past persecution, it's presumed that there's a well-founded fear of future persecution, but the burden is reversed in the absence of past persecution. And I found this case difficult more on the issue of past persecution than on the other issues that you've raised because it seems to fall somewhere in between our past cases discussing just how bad things have to be before we were compelled to call them persecution. And I didn't find any of our past cases really all that helpful. Yes, Your Honor. In fact, to that point, I guess I would rescind my earlier statement because there is a case that came out subsequent to our brief, our last brief, the case of Chor, C-H-H-O-R v. Lynch. It's unreported, but it's the 668 Fed Appendix 291, and it's an August 23, 2016 case. And we believe that they — We can't rely on unpublished dispositions. They're not precedential. Yes, Your Honor, I understand. But I believe that it is — it goes to Your Honor's point that this case lies in the middle, and I also believe that Chor lied in the middle between Gao and Gu, G-U and G-A-O, and that this case also is much similar to Mr. Duchamp's persecution than the case decided by the government. I can ask you a question. In the incident where Mr. Duchamp was beaten while he was sitting in the park, I believe, with his girlfriend, it's not clear to me, were the individuals who beat him random individuals? Were they law enforcement? It's not clear what precisely, and it seems like it might be important. So do you know, or does the record reflect? Your Honor, we believe that the record reflects that because they were out demonstrating, it was people who were in opposition to the demonstrations that were going on, on behalf of the Dachshund Party, that Mr. — But it's unclear, then, as you're saying. You don't know. I wouldn't say that there's positive evidence. No, there probably is not, Your Honor. Your Honor, the other points I wanted to raise were — Well, let me ask, because I think this goes important to what Judge Graber just highlighted in terms of the — if we are going to look at the past persecution, is there anything in the record, because it wasn't clear to me that he was detained by police and interrogated. It doesn't appear that way, but I wanted to be sure, and I wanted to make sure I asked you, so — No, he was attacked and chased, but not seriously detained and interrogated, as far as I can remember, in terms of my review of the record last week. The other two points that I want to raise briefly — The future persecution. Yes, Your Honor. You've cited to these reports, the State Department reports of the conditions in the country, that might indicate that individuals that are in opposition to the government are at risk of persecution. And you mentioned that your client had a very brief membership and was active in this Dashnak party. But for the past 25 years, he has not been active even from afar. He, as he said, has been living a quiet life. All I saw in the record was that he said, well, if he went back to Armenia, he'd have to speak out. Is that enough to show that he would be subject to a risk of future persecution, when that's all we have that would indicate that maybe he would involve himself again in some type of political dissent? Your Honor, I believe that the fact that Mr. Dashan did engage in political dissent while he was there would be indicative that he would do it again. I don't believe that the fact that he has been fortunate enough to live here since 1994 would be dispositive on the issue of whether or not he would revert to the same attitudes because of the lack of freedoms that do exist in Armenia as opposed to the United States. Mr. Dashan also had a wife and child that he had here in the United States. So his priorities were different, of course. As you know, they both tragically died. But we maintain that his life in this country is very different than what his life would be if he were returned to Armenia. But wasn't there also evidence in the record that at the time that he was a member, the leaders of that group or that party were actually in the United States and some of their activities were being directed from the United States? Some were here, Your Honor, but I believe that the bulk was there. And, of course, Armenia had just become a nation within two or three years of all of his activities. Your Honor, really briefly in the 30 seconds I have, I do want to address the issue of Nakara and the parole. The government raised last week a submission that his parole may not have been terminated because there was no written termination and that at the time that Mr. Dashan left, there required to be a written termination. Also, I'd like to point out that his parole status or his family's parole status was indefinite. Counsel, you got our order, right, asking about this issue. It was served on you earlier this week, which shows the regulation at the time that parole status terminated automatically as soon as someone departed the country and your client did depart the country while that regulation was in effect. Your Honor, I believe that what Ms. Barham has submitted stated that. I know what she submitted, but it may be incorrect is what I'm suggesting to you. Have you had a chance to review the regulation that we cited in our order? No, Your Honor. Unfortunately, I have not had that opportunity. I would welcome the opportunity to brief that. I realize I'm running out of time. I do also want to say that we believe that Mr. Dashan is eligible for Nakara because he entered before the date required. There was a finding that he is, of course, a Soviet Union citizen, and we believe that whatever the family filed to get here in 79, before the Refugee Act of 1980, whatever they filed should be considered an application for asylum and refugee status that would satisfy the second prong under Nakara. Thank you. Thank you, counsel. We'll give you a minute for rebuttal when the time comes. Thank you very much, Your Honor.  May it please the Court, I'm Sarah Byram, appearing on behalf of the United States Attorney General. Your Honors, if I may just address the Court's order from earlier this week and the dates of his exit as it relates to parole and Nakara. With respect to our letter earlier this week, yes, in submitting that letter, I did overlook those amendments, which the Court referenced in their order. With respect to then Petitioner testifying credibly and the fact that he states that he left late 81, early 82, it appears that his parole would have terminated automatically. I just wanted to state for completeness, though, that in the record there is some, there's actually in the record Petitioner gives many different dates as to when he left. He doesn't provide a clear answer. He says with respect to his early application in 1999, he states they returned in 1984, 1984-85, again 84. So certainly those would be past that amendment and would be automatic. But I want to note as well that in his asylum application, for example, he states that he lived in the Soviet Union. This is on record page 342, January of 1981, was in school in May 1981. Those would certainly fall behind before that amendment. Even if we construe this regulation in his most favorable term, it would seem that then there might be an issue that he would need some written termination. I would submit to you, though, that all of this ultimately for the issues that the court needs to decide today doesn't really matter. Petitioner only argues his parole with respect to NACARA. He uses it as a way to sort of bootstrap his parole into meeting the requirement that he has filed an asylum application. Now the statutory language is clear with respect to NACARA. He has to have a filed asylum application, and he can't get around that clear language. There's nothing to sort of bootstrap an indefinite grant of parole, which then he left on into a clear filing of asylum. So with respect to the dates, certainly the government admits that we muddled the waters a bit and then overlooked that amendment. If his parole did not terminate automatically, what would be the result of that analytically? What benefit would that be? With respect to NACARA or just generally? Generally. More generally, again, that's not something that the court needs to decide. I'd like the answer. What's the answer to that? If he would require some sort of written termination, that, of course, he's never argued. The agency hasn't had a chance to look at that. Counsel, just answer the question. It's not entirely clear. Presumably it seems as though because he had left, he would have abandoned that parole. It doesn't follow necessarily that it would have followed. What case or regulation says that it's abandoned if it's not terminated? Well, we don't have a case to cite to from that time period. So all we have is, you know, the regulation as it states. If his parole never terminated, then why wouldn't he have the opportunity to remain? I don't understand that. And some of this is, you know, murky also by the fact that this happened, you know, such a long time ago prior to the Refugee Act. All we have is the regulation. Granted, there isn't why I couldn't actually find any case that does that. It sounds like you don't even know the answer to my question, which is fine. Truthfully, if we don't. So you know that any time we ask, we always want the truthful answer. Respectfully, we don't. We would proffer that when, you know, parole as the way it's seen, even though he got an indefinite grant, and of course most people once they got paroled from somewhere like the former USSR didn't return, that that was only a temporary permission to enter and sort of remain while he was here. I'm making that up, though, because if the regulation requiring a written termination was in effect and he never received a written termination, then it isn't temporary. Well, parole, well, his grant of parole was indefinite. That's exactly right. So here's a follow-on question. Is this case a case that might be suitable to be mediated to figure out what is the most appropriate resolution? No. Why? Because in a couple of reasons. First, in the only way that petitioner has ever argued parole. He's never claimed it allows him to remain. I understand it's not one of the issues here, but usually mediation process is useful when there are things that aren't argued and aren't in the record that might actually have an effect on the outcome that would be a legally permissible and reasonable outcome. Certainly, if the court wishes to put it in mediation, we just don't feel that his issue of parole, outside of the context of what he's arguing for an ACARA, is something that the court needs to consider. It's not an issue that we do. But if it is true that he had indefinite parole that was never terminated, that would seem to affect the question of whether he's permitted to remain in the country, wholly apart from the arguments that are made in front of us, which is why I asked the question that I asked. You don't know today, it sounds like, and it's fine, I just need to say I don't know, that what the effect is if one of these dates that he testified to, because, as you say, there were more than one, the result is that his parole may not be terminated, what the effect that has? Certainly that is an issue that is relatively unexplored, given what has been briefed and also what was raised before the agency. So certainly that is an issue that if the panel feels is appropriate, we would explore that in mediation further. Respondent has done quite a bit of research prior to argument, and admittedly, given that, as you all are aware, that this happened such a long time ago, so we haven't really had the amount of case law and things like that to sort of provide us with clear answers. Again, I would just reiterate that, of course, for the issues that Petitioner has raised. The disposition of ultimately his parole outside of NACARA isn't before this Court. If I may move on to asylum. Petitioner has, well, he had conceded past persecution but then seemed to backtrack. We would argue that, in this case, Petitioner hasn't compelled the conclusion that he suffered harm rising to the level of past persecution. He has two incidents. What is your response to his argument about future persecution, even if he bears the burden of proof? With respect to future persecution, again, he hasn't shown that the record compels future persecution. Now, certainly, you know, reasonable fact-finders maybe could see that they could have decided that there was well-founded, but the standard is compelled, and he hasn't shown that. Really, his claim of future persecution is wholly speculative in many respects, and that just isn't enough. He did leave Armenia in 1994, which is a long time ago. Since he's been here, he hasn't been politically active. He testified that he just wants to live a quiet life, that he doesn't really want to be politically active, that maybe if he returns, he may speak up, depending on what happens. But there's nothing that shows that the government is currently interested in him. There's nothing that shows anything concrete that he faces an objectively reasonable, well-founded fear. In cases, for example, Mamouzian, which was discussed, that case can wholly be distinguished. The incidents of past persecution that that petitioner suffered don't even compare to what petitioner suffered in this case. In that case, there was numerous detentions, fired from job, she was fined, significant beatings, and those incidents combined, certainly the core found gave her a well-founded fear also in light of some of the country conditions. But in this case, we just don't have that, and there's really nothing that, in our opinion, makes this case rise to that level. Counsel, you've exceeded your time. You may sum up in a sentence or so. Thank you. Accordingly, we would ask this court to deny the petition for review on both Nicara and asylum. Thank you, counsel. Mr. Graziano, you have one minute for rebuttal. Thank you, Your Honor. Very briefly, the respondent, of course, would agree to any mediation. We believe that this is an unusual case because it is so old and because it does involve a parole that is related to refugee status and asylum status. And clearly, we want to make it clear that we believe that Mr. Dushan has already met the subjective standard for a well-founded fear of future persecution. The judge found his testimony to be credible, and we believe that that part of the test, the subjective test, has been met, and the country conditions that have basically been consistent from the founding of Armenia to today would provide evidence that the objective element should also be met. On the issue of the Nicara, there's a case of Hernandez-Mosquito versus Ashcroft, 293 F. 3rd, 1161, which was an equal protection challenge to the limitation date in the applications for asylum. And the court there said that Congress was concerned with protecting people who had suffered the type of harm that the asylum laws are there to protect. And we believe that this is exactly why Nicara should be available to Mr. Dushan because his family fled the Soviet Union during the Brezhnev era, which was a very oppressive time. He left in 1979. I believe that Brezhnev was in power until 1982. And so that was the whole reason for giving that kind of a parole at that time, although clearly the record evidence doesn't really state refugee or asylum in those words. That's clearly what was happening. Counsel, you've exceeded your extra time. Thank you, Your Honor. I appreciate your indulgence. Thank you. Thank you. The case just argued is submitted, and we thank both counsel.
judges: Graber, Murguia, Bolton